1  Claire M. Sylvia (State Bar No. 138990)
   Larry P. Zoglin (State Bar No. 87313)
2  PHILLIPS & COHEN LLP
   100 The Embarcadero, Suite 300
3  San Francisco, CA 94105
   Tel: (415) 836-9000
4  Fax: (415) 936-9001
   Email: cms@pcsf.com
5
   David J. Marshall (District of Columbia Bar No. 469949)*
6  KATZ, MARSHALL & BANKS, LLP
   1718 Connecticut Ave., N.W., 6th Floor
7  Washington, D.C. 20009
   Tel: (202) 299-1140
8  Fax: (202) 299-1148
   Email: marshall@kmblegal.com
9  *Application for *pro hac vice* admission pending

10 Counsel for Relator Stuart Rabinowitz

SEALED
BY COURT ORDER

11

12            UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
13

14
   UNITED STATES OF AMERICA, *ex rel.*
15 STUART RABINOWITZ,

   **CV  14  1049**
   Civil Action No:

16         Plaintiffs,

   **COMPLAINT**

17            v.

   **FILED IN CAMERA**
18 LOCKHEED MARTIN CORPORATION,    **AND UNDER SEAL**
   L-3 COMMUNICATIONS             **PURSUANT TO**
19 CORPORATION, EDO                **31 U.S.C. § 3730(b)(2)**
   CORPORATION, AND ITT EXELIS,

20
   **DEMAND FOR JURY**
21         Defendants.            **TRIAL**

22

23

24        Plaintiff-Relator, Stuart Rabinowitz, through his attorneys Phillips & Cohen LLP, on

25 behalf of the United States of America for this Complaint against Defendants Lockheed Martin

26 Corporation, L-3 Communications Corporation, EDO Corporation, and ITT Exelis, alleges based

27 upon personal knowledge, relevant documents, and information and belief, as follows:

28

## I. NATURE OF THE ACTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants Lockheed Martin Corporation, L-3 Communications, EDO Corporation, and ITT Exelis and/or their agents, employees, and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. § 3279, *et seq.* ("FCA"). This is also an action by Plaintiff-Relator Stuart Rabinowitz to recover damages for Defendant Lockheed Martin Corporation's unlawful termination of his employment in violation of the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h), which prohibits an employer from terminating an employee because of the employee's efforts to stop violations of the FCA.

2. The FCA was originally enacted during the Civil War to redress fraud against the Government, including fraud in the sale of defective products to the military. Congress amended the Act in 1986, and again in 2009 and 2010, to enhance the Government's ability to recover losses sustained as a result of fraud against the United States. The Act was substantially amended in 1986 because Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating fraud against the federal Government, was in need of modernization. The 1986 amendments created incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction. Additionally, the amendments created incentives for the private bar to commit legal resources to prosecuting fraud on the Government's behalf. Congress further amended the Act in 2009 and 2010 to fill gaps in the Act's coverage, clarify ambiguities in the Act's drafting, and correct misinterpretations of the intended scope of the Act that had emerged in the case law following the passage of the 1986 amendments, including with regard to the Act's anti-retaliation provision.

3. The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. The FCA also prohibits making or using, or

1  causing to be made or used, false statements or records material to false or fraudulent claims for

2  payment.

3      4.      The FCA authorizes any person having information about false or fraudulent claims

4  against the Government to bring an action on behalf of the Government, and to share in any

5  recovery.  Such an action is called a "*qui tam*" action and the person bringing the action is a

6  "relator."  The Act requires that the complaint be filed under seal for a minimum of 60 days

7  (without service on Defendants during that time) to enable the Government to conduct its own

8  investigation and to determine whether to join the suit.

9      5.      Based on the FCA, *qui tam* Plaintiff and Relator Stuart Rabinowitz seeks to recover

10  all available damages, civil penalties, and other relief for the federal violations alleged herein.

11  **II.      INTRODUCTION**

12      6.      This case concerns the false statements and false claims made and caused to be

13  made by Defendants Lockheed Martin Corporation, L-3 Communications, EDO Corporation, and

14  ITT Exelis, regarding the defective communications system that they developed and sold to the

15  United States for use on the Coast Guard's National Security Cutters ("Cutters").  The Cutters'

16  communications system is integral to executing Coast Guard operations, including the search for

17  and rescue of mariners or other persons in distress, interdiction and seizure of vessels smuggling

18  undocumented migrants or illegal substances, and protection against terrorist acts on open waters.

19      7.      Because the Cutters must be able to perform multiple operations at the same time,

20  for example, both a rescue operation and an interdiction of an illegal drug operation, the Cutters'

21  communications system must be capable of transmitting and receiving several different radio

22  signals at the same time without undue interference ("simultaneous operations").  If the

23  communications systems are unable to do this, the Cutters' missions could be severely

24  compromised.

25      8.      The simultaneous operations requirement is set forth in specifications incorporated

26  into the contracts and subcontracts that Defendants entered into agreeing to supply

27  communications systems for the Cutters.

28

9.      The Cutters' communications systems consist of numerous Ultra High Frequency (UHF) and Very High Frequency (VHF) radios, which interface with several thousand pounds of radio frequency distribution equipment, known as the Radio Frequency Distribution System ("RFDS System"). The RFDS System is intended to provide control over the Cutters' UHF and VHF radios and to mitigate interference among these radios during simultaneous operations. The RFDS System was to achieve this result by suppressing the broadband noise around each channel through the use of numerous components, including transmit side mitigation ("TSM") hardware.

10.     Because of design defects in the RFDS System of which Defendants were aware but of which the Government was unaware, the TSM installed on the Cutters creates so much noise of its own that it eliminates any benefit the RFDS System was supposed to provide, rendering it impossible for the Cutters' communications systems to meet the simultaneous operations performance specifications. As a result, Defendants knowingly supplied and caused to be supplied to the Government multiple communications systems that did not comply with the contractual requirements stating that each communications system be capable of simultaneous operations, notwithstanding Defendants' representations that the systems did comply. Defendants knowingly concealed from the Government the deficiencies with the communications systems.

11.     Defendants also charged the Coast Guard for thousands of hours of help desk tickets and "optimization" efforts to resolve problems caused by the defective communications system on at least one Cutter, amounting to millions of dollars in costs that would not have been incurred if the system Defendants provided had complied with material contractual requirements, as Defendants had represented it did. Defendants charged the Coast Guard for these efforts despite the fact that Defendants knew that these efforts could not cure the defects in the communications system Defendants had supplied.

12.     Rather than alert the Government to the root cause of the deficiencies in the communications system, Defendant Lockheed Martin sought to profit from the problems by proposing that the Government replace the faulty communications system at additional cost with a new system that Lockheed had designed.

1 | **III.   PARTIES**

2 |     **A.   The Relator**

3 |     13.      Plaintiff/Relator Stuart Rabinowitz ("Relator") is an individual residing in Marlton,

4 | New Jersey.

5 |     14.      Relator worked as a Lead Member of the Engineering Staff of Defendant Lockheed

6 | Martin Corporation in Moorestown, New Jersey, from 2000 to 2005, and as a Principal Member of

7 | the Engineering Staff from 2005 to 2012. From 2004-2005, Relator provided technical oversight

8 | on the development of the RFDS System for the Coast Guard's Cutters. In 2010, Relator returned

9 | to the project and consulted on the project on several occasions, including in June 2010 when he

10 | was assigned to investigate the Coast Guard's complaints about an audio bleed-through problem

11 | that frequently rendered one of the Cutters' VHF communications system unusable. Defendant

12 | Lockheed Martin Corporation terminated Relator's employment on July 10, 2012, in retaliation

13 | for his repeated efforts to stop his employer from defrauding the Government in connection with

14 | the Cutter project.

15 |     **B.   Defendant Lockheed Martin Corporation**

16 |     15.      Defendant Lockheed Martin Corporation ("Lockheed") is a Maryland corporation

17 | with headquarters in Bethesda, Maryland. Lockheed is the world's largest defense contractor and

18 | specializes in global security, aerospace, and information technology.

19 |     **C.   Defendant L-3 Communications Corporation**

20 |     16.      Defendant L-3 Communications Corporation ("L-3") is a Delaware corporation

21 | with headquarters in New York, New York. L-3 Communication Systems-East, which is a

22 | division of L-3, designs and manufactures integrated communications systems that support naval,

23 | ground, space, and air operations.

24 |     **D.   Defendant EDO Corporation**

25 |     17.      Until 2007, EDO Corporation ("EDO") was a New York corporation that designed

26 | and manufactured a variety of products for defense, intelligence, and commercial markets. EDO

27 | was acquired by ITT Corporation in 2007.

28 |

1

**E.     Defendant ITT Exelis**

2       18.     ITT Exelis is an Indiana corporation with headquarters in McLean, Virginia.  In

3  2011, ITT Corporation was segmented into three independent, publicly traded companies.  The

4  defense segment of ITT Corporation became ITT Exelis, which became a publicly traded

5  company as of October 31, 2011.  EDO's assets became part of ITT Exelis, and ITT Exelis

6  (hereafter referred to as "ITT") is a successor in interest to EDO's liability.

7  **IV.     JURISDICTION AND VENUE**

8       19.     **Jurisdiction**.  This Court has jurisdiction over the subject matter of this action

9  pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers

10  jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

11      20.     Although the issue is no longer jurisdictional, to Relator's knowledge there has

12  been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint,

13  as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, §

14  10104(j)(2), 124 Stat. 119, 901-02.  Moreover, whether or not such a disclosure has occurred,

15  Relator would qualify as an "original source" of the information on which the allegations in this

16  Complaint are based.  Before filing this action, Relator voluntarily disclosed to the Government

17  the information on which the allegations or transactions in this Complaint are based.  Additionally,

18  Relator has direct and independent knowledge about the misconduct alleged herein and that

19  knowledge is independent of and materially adds to any publicly disclosed allegations or

20  transactions relevant to his claims.

21      21.     This court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

22  3732(a) because one or more Defendants can be found in, reside in, or have committed acts related

23  to the allegations in this Complaint in this judicial district.

24      22.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1395(a),

25  31 U.S.C. § 3732(a) and U.S.C. § 3730(h)(2) as one or more Defendants can be found in, has or

26  had an agent or agents, has or had contacts, and transacts or transacted business in this district, and

27  because much of the conduct at issue in this case occurred in this judicial district.

28

1     23.     **Intradistrict Assignment**. Facts giving rise to this cause of action occurred in

2 Alameda County.

3 **V.**     **BACKGROUND**

4     **A.**     **Overview of the Coast Guard's NSC Project**

5     24.     The United States Coast Guard has invested roughly $30 billion in major

6 acquisition projects to modernize the Coast Guard's ships, aircraft, boats, and other assets through

7 the Integrated Deepwater System Program ("Deepwater"). Among those projects is the NSC

8 Project, which involves replacement of the Coast Guard's aging 378-foot High Endurance Cutters

9 with a fleet of National Security Cutters ("NSC", "Cutters", or "Cutter"). The Coast Guard has

10 hailed the Cutters as the "largest and most technologically advanced of the Coast Guard's newest

11 classes of cutters" and as "the centerpiece of the Coast Guard's fleet, capable of executing the

12 most challenging operations, including supporting maritime homeland security and defense

13 missions."

14     25.     To date, three Cutters have been delivered to the Coast Guard, each at the cost of

15 several hundreds of millions of dollars: the first Cutter, the Bertholf, was delivered to the Coast

16 Guard in May 2008; the second Cutter, the Waesche, was delivered to the Coast Guard in

17 November 2009; and the third Cutter, the Stratton, was delivered in September 2012. The fourth

18 Cutter, the Hamilton, was launched in August 2013 and was commissioned on October 28, 2013.

19 The fifth and sixth Cutters are currently under construction, and a materials option contract for the

20 production of a seventh Cutter was awarded in June 2013.

21     **B.**     **The Contracts for the Cutters**

22     26.     In June 2002, the Coast Guard signed a $17 billion contract with Lockheed and

23 Northrop Grumman Corporation as part of the Deepwater program. Lockheed and Northrop

24 Grumman formed a joint venture, known as Integrated Coast Guard Systems, to supply the Coast

25 Guard with ninety-one new ships, among them the first three Cutters. While Northrop Grumman

26 was charged with building and designing the Cutters, Lockheed was charged with designing and

27 advancing a fully integrated Command, Control, Communications, Computers, Intelligence,

28

1 | Surveillance, and Reconnaissance ("C4ISR") network to link the new and upgraded Cutters,

2 | aircraft, and Coast Guard shore facilities.

3 |     27.      L-3 was a communications system subcontractor for Lockheed on the Deepwater

4 | program. As a subcontractor to Lockheed, L-3 was responsible for integrating the voice, video,

5 | and data communications for the Coast Guard's Cutters, boats, and shore command stations.

6 |     28.      L-3, in turn, subcontracted with EDO to develop communications equipment for

7 | the Cutters and other Coast Guard vessels.

8 |     29.      Between 2004 and 2010, EDO and L-3 were responsible to Lockheed for the

9 | design and development of the RFDS Systems installed on Cutters one through three.

10 |     30.      After 2010, the Coast Guard stopped contracting with Integrated Coast Guard

11 | Systems for production of the Cutters and began contracting directly with Northrop Grumman,

12 | and later with Huntington Ingalls Industries ("HII"), for production of the fourth Cutter. Cutters

13 | five, six and seven are under contract directly with HII.

14 |     31.      As of June 2013, HII had awarded Lockheed subcontracts to provide the complete

15 | C4ISR systems for the fourth, fifth, and sixth Cutters.

16 |     **C.**    **Overview of the Cutters' RFDS System**

17 |     32.      The Cutters' communications systems consist of numerous Ultra High Frequency

18 | (UHF) and Very High Frequency (VHF) radios, which transmit and receive signals using

19 | electromagnetic waves along certain radio frequency channels. These radios interface with several

20 | thousand pounds of radio frequency distribution equipment, known as the Radio Frequency

21 | Distribution System ("RFDS System"). The RFDS System is intended to provide control over the

22 | Cutters' UHF and VHF radios and to mitigate interference among the radio frequency channels

23 | during simultaneous operations.

24 |     33.      Simultaneous operations refer to when both the transmitters and the receivers on

25 | the Cutters are operating at the same time. Simultaneous operations are particularly complex on

26 | Coast Guard vessels because these vessels require extensive use of the "marine band," a very

27 | narrow band of radio frequency channels ranging from 156 to 162 MHz. The radios on-board the

28 | Cutters are used for missions such as the interdiction of illegal drug operations, national

1  emergency response, and search and rescue, all of which may be occurring at the same time. With
2  numerous transmitters and receivers operating at the same time within such a narrow range of
3  frequency channels, techniques that are typically effective in other settings to control interference
4  between radio frequency channels are inadequate for the Cutters. Therefore, the RFDS System is
5  a critical component of the Cutters' communications system.

6      34.     The components of the RFDS System that are most relevant to achieving
7  simultaneous operations are the Transmit Side Mitigation circuitry ("TSM") and the interference
8  cancellation system.

9      35.     The TSM operates to suppress excess noise associated with the transmission of
10 *outgoing* signals. During the transmission of a signal along a specific radio frequency channel,
11 white noise known as "broadband" noise is produced. The amount of broadband noise can vary
12 depending on the type of radio used and the radio frequency channel on which the communication
13 is occurring. An effective TSM would be able to greatly reduce the amount of broadband noise
14 during transmission, although it cannot eliminate broadband noise completely because the TSM
15 itself creates some noise.

16     36.     The interference cancellation system complements the TSM by eliminating other
17 types of interference, and by ensuring that any broadband noise the TSM cannot suppress does not
18 interfere with the ability of the Cutters to receive *incoming* signals. When too much noise
19 interferes with incoming signals, the receivers become "desensitized" and cannot pick up
20 incoming signals they would otherwise be able to receive. The interference cancellation system
21 performs its function by taking small samples of the transmitter signal, adjusting the amplitude
22 and phase of these samples, and putting out an "anti-phase" version of the noisy signal, which
23 cancels the unwanted noise. An anti-phase signal is essentially an "upside down" version of the
24 interference, which is inserted between the transmitter and receiver. When in-phase and anti-
25 phase signals are combined, they cancel one another out completely, eliminating the unwanted
26 noise.

27     37.     Each Cutter's communications system, which includes the RFDS System, costs
28 millions of dollars. L-3's cost proposal for the first Cutter estimated that the production and

1  deployment costs for the Cutter's communications system would exceed \$7.2 million. The

2  production and deployment costs for the Cutters' communications systems have steadily increased

3  with each Cutter. L-3's communications cost proposal for the fifth Cutter estimated that the costs

4  would exceed \$19 million.

5      38.    The RFDS System is an expensive component of the communications system. The

6  cost estimate for the fifth Cutter's RFDS System was approximately \$6.9 million, with recurring

7  costs for the RFDS System of approximately \$6.6 million.

8      39.    Lockheed, L-3, and EDO were jointly involved in the development of the RFDS

9  System for the Cutters. As discussed in further detail below, Lockheed, L-3, and EDO staff

10  frequently attended design meetings together and exchanged feedback and data regarding the

11  performance of the RFDS System.

12      **D.**    **Government Specifications for the Cutters' Communications System**

13      40.    The performance specifications are incorporated into the contracts for the Cutters

14  and their communications systems, and are included in various Delivery/Task Orders ("DTO"),

15  including DTO # HSCG23-07-J-2DW246 and DTO # HSCG23-09-J-2DC302. The specifications

16  require that the Cutters' communication systems be capable of simultaneous operations. The

17  Performance Specification (Rev. K) provides in Paragraph 3.3.7.3.12:

18  
19  > The NSC [Cutters] shall be capable of communicating simultaneously with two boarding parties without inference with each other.

20  The level C performance specifications (C4ISR Asset Performance Specifications), Requirements

21  ID-Comm-1200 and ID-Comm-1198, require that the communications system be capable of

22  supporting 4 simultaneous circuits:

23  
24  > The Exterior Communications Subsystem shall simultaneously support 4 transmit/receive communications circuits plus 2 receive only communications circuits in the UHF frequency range of 225 to 512 MHz.

25  
26  > The Exterior Communications Subsystem shall simultaneously support 4 transmit/receive communications circuits plus 2 receive only communications circuits in the VHF frequency range of 118 to 174 MHz.

27  
28

1   *See also* 3.2 Level C4ISR Subsystem Specification, Requirement ID-Comm-715 ("The Exterior

2   Communication Subsystem shall simultaneously support 4 transmit/receive communications

3   circuits plus 2 receive only communications circuits in the UHF frequency range of 225 to 512

4   MHz."); 3.2 Level C4ISR Subsystem Specification, Requirement ID-Comm-1348 ("The Exterior

5   Communications Subsystem shall support up to 4 transmit/receive plus 2 receive only

6   simultaneous communications circuits in the VHF frequency range of 118 to 174 MHz.").

7       41.     The specifications further provide that those simultaneous circuits must be able to

8   operate with only minimal interference to receiver sensitivity:

9       The simultaneous communications circuit capability for VHF High Band shall
10      accommodate signals with center frequency separation between adjacent transmit
        and receive channels as low as 250 kHz without degrading the receiver sensitivity
11      by more than 4 dB, except in some special cases where intermodulation products,
        spurs and harmonics may interfere with the reception of the signal.
12

13      The simultaneous communications circuit capability for UHF High Band shall
        accommodate signals with center frequency separation between adjacent transmit
14      and receive channels as low as 250 kHz without degrading the receiver sensitivity
        by more than 4 dB, except in some special cases where intermodulation products,
15      spurs and harmonics may interfere with the reception of the signal.

16  See 3.2 Level C4ISR Subsystem Specification, Requirements ID-Comm-2392 and ID-Comm-

17  2393.

18  **VI.    DEFENDANTS' FRAUDULENT PRACTICES**

19      42.     By knowingly failing to inform the Government that the RFDS System did not

20  conform to critical simultaneous operations specifications, making material omissions and

21  representations regarding compliance with those specifications, and charging the Government for

22  useless efforts to fix problems that were byproducts of the Defendants' faulty design, Defendants

23  made and caused to be made false claims and false statements and engaged in a fraudulent course

24  of conduct to get false or fraudulent claims paid by the Government.

25      **A.     The RFDS System's Key Deficiencies**

26      43.     The purpose of the Cutters' RFDS System is to mitigate interference between radio

27  frequency channels to facilitate the simultaneous operation of transmitters and receivers.  To

28  accomplish that, the system uses custom-designed, specialized components, including Transmit

1   Side Mitigation circuitry ("TSM") and an interference cancellation system.  The multiple

2   components are intended to be interdependent, working together in order to achieve full

3   performance during simultaneous operations.

4       44.     During the design phase for the RFDS System, EDO stated that the entire system

5   architecture relied on this interdependent design, with each component contributing a specified

6   amount of noise suppression or cancellation in order to achieve peak performance.  EDO

7   represented that the TSM was designed to suppress up to 80 decibels of broadband noise during

8   transmission of outgoing signals, while producing very low levels of broadband noise itself.  EDO

9   further represented that the interference cancellation system would contribute additional noise

10  suppression of 8 to 20 decibels.  At these levels, the RFDS System would exceed performance

11  specifications and there would be no danger of receiver desensitization while a Cutter was

12  engaged in simultaneous operations.

13      45.     The TSM that Defendants provided to the Government actually produces

14  broadband noise of its own at levels 300,000 times (55 decibels) higher than Defendants

15  represented it would.  Although the TSM does suppress broadband noise coming directly from the

16  transmitting radios, its generation of 55 decibels of additional white noise during operation wholly

17  eliminates any benefit of the RFDS System, and in fact degrades the overall performance of the

18  communications infrastructure, because the remaining components of the RFDS System cannot

19  sufficiently suppress the excess noise the TSM generates.

20      46.     This defect has several major effects on the receiver functions of the Cutters'

21  communications systems and on other communicating entities, such as vessels, aircraft, lifeboats,

22  or ports on land.

23      47.     First, the excess noise that the TSM generates desensitizes the receivers on-board

24  the Cutters, preventing the receivers from picking up incoming communication signals during

25  simultaneous operations.

26      48.     The TSM's defects have domino effects on the other components of the RFDS

27  System, specifically the interference cancellation system.  Because the TSM is putting out over 50

28  decibels of additional noise, the interference cancellation system must cancel at least that amount

1 in order for the receivers to be able to pick up incoming signals. This is well beyond the

2 interference cancellation system's design capability, which was to cancel between 8 to 20 decibels

3 of noise in the worst-case scenario. Consequently, there is too much interference across radio

4 frequency channels and the receivers become desensitized.

5    49.    When receivers become desensitized, it is particularly difficult for the Cutters'

6 receivers to pick up low level signals, such as those from a starting point that is very far away or

7 originating from smaller, less powerful radios. Desensitization of the receivers can reduce the

8 communications range of a Cutter by over ninety percent, from tens of miles to several hundred

9 yards. There are especially dangerous implications when Cutters are engaged in rescue operations

10 or are communicating with parties in distress. Low level distress signals, such as from the kinds

11 of radios found on lifeboats, can be completely drowned out. Moreover, because the interference

12 is coming from the RFDS System itself, radio operators may have no indication that

13 communication failures are occurring.

14    50.    Second, the TSM's defects negatively impact other functions of the Cutters that

15 also rely on electromagnetic signals, such as direction finding trackers and intelligence gathering

16 operations. Intelligence gathering operations, such as activities including but not limited to

17 tracking movements of targets or tuning into the communications between parties of interest,

18 depend on the ability of Cutters to effectively receive signals from the target. These operations are

19 an essential part of rescue and national security actions, which are core duties of the Coast Guard.

20 The excess noise generated by the TSM has the same desensitizing effects on the receivers for

21 these functions as it has on the Cutters' direct communication receivers, which prevents the

22 Cutters from effectively executing missions.

23    51.    Finally, the levels of interference from the TSM are so high that they impact

24 receiver functions on nearby assests, preventing other ships or aircraft from receiving desired

25 signals from one another. The TSM desensitizes the receivers on other vessels up to an 11 km

26 radius around a Cutter. Consequently, third party communications are impaired, for no other

27 reason than their proximity to a Cutter.

28

52.     The delivered communications systems thus failed to meet the material performance specifications requiring that the system be capable of simultaneous operations with minimal interference to receiver sensitivity.

53.     Lockheed and L-3 have attributed the RFDS System's failure to meet contractual performance specifications to architectural changes the U.S. Coast Guard made to the Cutters, but the RFDS System could not have met the specifications even without these changes.

### B.     Defendant EDO Knew of and Ignored the Defects During the Design and Development Phase for RFDS

54.     During the Preliminary Design Review ("PDR") for the RFDS System in August of 2004, EDO promised that the TSM circuitry would suppress approximately 80 decibels of broadband noise.  If the TSM were to meet this goal, it would suppress sufficient levels of broadband noise associated with the transmission of outgoing signals such that there would be minimal interference with the receivers attempting to pick up incoming signals.  This would allow the interference cancellation system to operate with a simplified, more cost-efficient, and more reliable design than other alternatives.

55.     By December 2004, EDO knew that its TSM had a defective design and was producing excessive noise.  On December 15, 2004, EDO presented a Critical Design Review ("CDR") to Lockheed and L-3.  In the CDR presentation, EDO presented several slides addressing the TSM, but did not acknowledge that there was a problem with the TSM or that the transmitter noise had increased by a factor of more than 300,000 since the PDR.  EDO did not explain that the TSM would have negative impacts on the communications system's functionality.

56.     Instead, during the CDR, EDO presented data from a test configuration that was not representative of realistic simultaneous operations conditions, which made the TSM appear more effective than it was.

57.     Among other things, EDO used an ARC-210 radio rather than a VHF marine radio for its testing.  ARC-210 radios are multi-mode military radios that have many more capabilities but produce more broadband noise during transmission than the specialized VHF radios.  By inflating the amount of noise from the starting point of the radio signal, EDO was able to make it

1  appear that the TSM was producing less noise than the radio itself, and thus that the TSM was able

2  to meet its performance goals in suppressing noise.

3    58.    Additionally, EDO performed the tests at a higher radio frequency channel (173

4  MHz) than the marine band frequencies most often employed on the Cutter (156-162 MHz).  This

5  also artificially increased the amount of broadband noise transmitted by the radio before reaching

6  the TSM, which made the TSM appear more effective at suppressing noise than it would be under

7  actual conditions.  In fact, during laboratory tests of the RFDS System performed by the Relator in

8  2011, it was determined that the TSM actually increased the transmitted noise, rather than

9  suppressed it.

10    59.    The way EDO presented its data allowed it to conceal the fact that the RFDS

11  System would not meet specifications once installed on a Cutter.

12    60.    Had EDO presented data on how the TSM would perform under actual conditions,

13  it would have been clear that the TSM could not meet the performance specifications.

14    61.    In 2010, once the TSM's defect could no longer be ignored by Lockheed, EDO

15  (then ITT) admitted that the excess noise coming from the TSM was consistent with what it knew

16  at the time of the 2004 CDR.

17    C.    **L-3 Knew of the Defects by at Least December 2007 After Performing Tests on
the First Cutter**

18

19    62.    Throughout its performance under the subcontract for the RFDS System, L-3

20  produced monthly program status reports to Lockheed tracking the progress of the project and

21  detailing risks and accomplishments of each product.  L-3 never identified the TSM as a risk or

22  concern in these reports.

23    63.    In December 2007, EDO measured the transmitter noise levels of the TSM that was

24  installed on the Bertholf.  This data was provided to Vince Pansera, an engineer at L-3.  This data

25  revealed to L-3 that the TSM noise output was responsible for reduced radio sensitivity and the

26  cause of receiver desensitization; and that it was not possible for the communications system on

27  the first Cutter to meet the performance specifications for simultaneous operations without

28  extensive modification.

1    64.    After L-3 became aware that the TSM was defective, it did not propose to fix the

2  TSM before delivery of the Bertholf in May of 2008.  Instead, L-3 knowingly submitted

3  certificates of compliance to Lockheed Martin stating that current performance met all

4  performance specifications, which included the specifications for simultaneous operations.

5    65.    Later, in L-3's June 2008 Capabilities and Limitations documents (Rev. F) that it

6  submitted to Lockheed, L-3 acknowledged that current performance was not meeting specification

7  when it stated, "The test results shown . . . indicate the RFDS co-site mitigation system is not

8  functioning to meet the NSC 3.2 [Specification] Requirements," namely, the requirements for

9  simultaneous operations.

10    66.    Instead of addressing the problem of the TSM, L-3 recommended "optimization" of

11  the ship's structure and antenna arrangement.  Optimization involves a complete recalibration and

12  re-tuning of the interference cancellation system in order to enable it to cancel higher levels of

13  noise interfering with the receivers.  L-3 attributed the need for optimization to significant changes

14  in the architectural design of the Cutter by the U.S. Coast Guard after initial measurements were

15  made.  However, the TSM is not dependent on architectural design in the same way as the

16  interference cancellation system.  Had the design of the ship not been changed, the TSM would

17  still not have met the performance specifications.

18    67.    At the time L-3 recommended optimization, it knew or recklessly disregarded or

19  acted in deliberate ignorance of the fact that the TSM was generating over 50 decibels of

20  additional broadband interference which would not be resolved by optimization.

21    68.    Between 2008 and 2011, L-3 performed at least two optimizations on the Bertholf.

22  These optimizations cost the Government over $3 million in continuing repairs that did not

23  resolve, and L-3 knew could not have resolved, the RFDS System's problems.

24       **D.    Lockheed Discovered that the RFDS System Was Defective and Failed to
25            Notify the Coast Guard**

26            **1.    Lockheed Turned a Blind Eye to the Defect**

27    69.    In or about August 2005, while the RFDS System was still under development,

28  Lockheed learned that serious technical issues with the system were beginning to surface.  Rather

1 than investigate and resolve these technical issues, Lockheed deferred to L-3 to address these
2 problems with EDO independently.  Additionally, Lockheed transitioned Relator and other
3 personnel with subject matter expertise away from these projects.  In their place, Lockheed moved
4 personnel with virtually no subject matter expertise in oversight positions in order to expedite the
5 process.

6     70.    An e-mail dated August 10, 2005 from Relator's supervisor Kenneth Hummel
7 attests to Lockheed's awareness of technical problems with the communications system and its
8 attempt to shift responsibility to L-3 and EDO.  In the email, Hummel, a C4ISR Equipment
9 Systems Design Lead, instructed Relator not to travel to EDO's design review meeting and instead
10 suggested that Relator participate through a phone conference for the parts of the meeting where
11 EDO and L-3 needed Lockheed's guidance.  Hummel stressed that, "EDO is a sub-contractor of
12 L-3, so L-3 is responsible, and should be capable of conducting the design review and working on
13 solutions. . . . I recommend you let them work out the design issues."

14     71.    Even as Lockheed encouraged its staff to defer to L-3 and EDO and "let them work
15 out the design issues" with the communications system, Lockheed maintained an oversight role
16 over its subcontractors.  For example, in encouraging Relator to let L-3 and EDO address the
17 design issues, Hummel emphasized that these subcontractors must continue to report to Lockheed:
18 "They should report out to us so we can gauge whether they have the issues under control and how
19 they plan to meet the design and schedule requirements."

20         **2.    Lockheed Knew that the RFDS System was Defective Before Delivery**
21             **of the Bertholf**

22     72.    Defendants never conducted comprehensive onboard testing of receiver
23 desensitization prior to delivery to confirm that the RFDS System as installed on the ship would
24 meet performance specifications.  Although Defendants had the ability to perform detailed testing,
25 Defendants Lockheed and L-3 conducted only subjective tests that did not include standard testing
26 equipment or objective measurements.  In April 2008, Lockheed and L-3 simply sent test signals
27 to the ship from teams on shore using portable, handheld devices.  This testing was the equivalent
28 of asking, "Can you hear me now?"  Lockheed and L-3 knew the test methods they employed

1   would be inadequate to accurately measure the effectiveness of the RFDS System.  Nevertheless,

2   even the extremely unsophisticated testing Lockheed employed confirmed that performance

3   specifications for simultaneous communications would not be met.

4       73.     Defendants did not inform the Coast Guard of these results and the Bertholf was

5   delivered to the Coast Guard one month later without correcting the defect in the RFDS System.

6                   **3.      Relator Discovered Problems with the TSM and Notified the**
                            **Defendants**
7

8       74.     In June 2010, Lockheed assigned Relator to investigate deficiencies in the RFDS

9   System in response to complaints from the Coast Guard about the system's failure to function

10  during simultaneous communications.  During Relator's investigation into the cause of the

11  Cutters' communication failures, Relator discovered Defendants' inadequate testing of the RFDS

12  System.  In July 2010, Relator visited the Bertholf while it was docked in its homeport of

13  Alameda, California, and conducted comprehensive testing of the system's performance.  Relator

14  was told by the crew on-board the Cutter that the communications team had experienced

15  difficulties in at least one instance when communicating with a nearby helicopter while it was

16  attempting to land on the Cutter's helipad.  The Cutter's receivers had experienced "audio bleed-

17  through" and could not receive signals from the helicopter while the Cutter was simultaneously

18  transmitting another signal.  Although the helicopter was able to land safely, the crew was

19  troubled by the dangerous implications of this problem.

20      75.     Relator took objective measurements of the communications system's performance

21  and found that receiver performance was severely degraded during simultaneous operations.  In

22  certain trials Relator conducted, receiver desensitization was measured at 24 decibels.  The impact

23  of this level of receiver desensitization was that test signals sent to the Cutter needed to be

24  increased by over 24 decibels in order for the receiver to pick up the signal.  Performance

25  Specifications ID-Comm-2392 and ID-Comm-2393 required that receiver desensitization be no

26  more than 4 decibels.  The testing revealed that the RFDS System was failing to meet performance

27  specifications by 20 decibels.

28

1    76.    Receiver desensitization at these levels can reduce the receiver range on the
2  Bertholf by up to *ninety percent* during simultaneous operations. While the Bertholf transmits a
3  signal, the TSM generates excess noise which interferes with the receivers. In this situation, low
4  level incoming signals would never be received by the Cutter, especially signals coming from
5  further than a few hundred yards away.

6    77.    In a memorandum dated August 3, 2010, Relator notified Lockheed of his test
7  results and described in detail the numerous failures that occurred during testing. Relator wrote
8  that "significant de-sensitization of the M7100 receivers was observed, during operation of a
9  single transmitter," and he explained that "this desensitization appears to be caused by transmitter
10 broadband noise."

11   78.    Relator listed several recommendations in his August 2010 memorandum. In
12 particular, he recommended that additional troubleshooting be performed on the Cutter, test results
13 be submitted to and reviewed by both L-3 and ITT, and an analytical assessment of transmitter
14 noise levels be performed.

15   79.    Following the release of Relator's memorandum, Vince Pansera of L-3 provided
16 Relator with a copy of the transmitter noise data that was recorded by EDO in December 2007,
17 noting that the excessive transmitter noise "didn't surprise anyone." Relator found that the data
18 recorded in December 2007 was consistent with his findings from the 2010 onboard testing.

19   80.    Relator submitted his analysis to Lockheed in a September 20, 2010, memorandum.
20 His memorandum explained that there were 54.9 decibels more broadband noise during
21 transmission in both 2007 and 2010 than was promised during the design reviews in July 2004.
22 Relator's 2010 testing identified the TSM as the part of the RFDS System responsible for the
23 excess noise.

24   81.    Relator's memorandum warned Lockheed that this increase in transmitter noise had
25 and would continue to have a substantial impact on the communication system's performance, and
26 that this serious impairment to communications would often occur without any overt signs to the
27 operators of the system. Relator recommended that the company resolve this issue "urgently."

28

COMPLAINT

1

2

**4.   Defendants Agreed Not to Reveal Defects to the Coast Guard and to Continue Charging for Useless Optimization Efforts**

3   82.   From 2008 to 2011, L-3 and Lockheed corresponded with one another about the
4   problems with the RFDS System.  L-3 and Lockheed decided to sell the Coast Guard
5   "optimization" projects that they knew would not address the TSM's deficiencies.  Relator's
6   analysis and recommendations cast significant doubt on the value of L-3 and Lockheed's
7   optimization projects as a solution to the problems in the RFDS system, and made it more difficult
8   for Defendants to sell the Coast Guard on the optimization efforts as a viable way to address the
9   TSM shortcomings.

10   83.   In September or October 2010, Lockheed circulated Relator's memorandum
11   regarding the RFDS System defects to L-3 and EDO and asked them to respond.  L-3 and
12   Lockheed had several meetings and communications about this issue with the goal of formulating
13   a response to the Coast Guard.

14   84.   In correspondence between L-3 and Lockheed regarding this issue on October 20,
15   2010, L-3 agreed that during simultaneous operations at certain radio frequency channels the
16   reception range is reduced to less than five nautical miles.  L-3 also agreed that even with
17   optimization or redesign of parts of the interference cancellation system, the RFDS System would
18   not be able to meet performance specifications relating to simultaneous operations.

19   85.   L-3 requested additional funding to "go back to basics" in order to "determine how
20   the data for broadband noise was measured and/or calculated, . . . understand the topside design
21   changes, and do the necessary design updates."  L-3 did not propose fixing the TSM.

22   86.   Relator's repeated efforts to convince Lockheed management to correct the
23   deficiencies in the RFDS System, in particular his memorandum of August 3, 2010, angered
24   Lockheed senior managers responsible for the NSC project. In September 2010, Lockheed senior
25   managers and HR representatives held meetings with Relator's direct supervisor, Patrice Mullen,
26   at which they pressured her and eventually directed her to issue Relator a negative performance
27   evaluation that would reduce his performance ranking from a "2" to a "4" out of "5", very near the
28   bottom of Lockheed's ranking system.  Ms. Mullen was so taken aback by this direction, which

1    she knew was inconsistent with Relator's exemplary job performance, that she emailed Lockheed

2    Director Jim Calabrese to register her disagreement.  Lockheed overrode Ms. Mullen's opposition

3    and issued Relator a negative appraisal in December 2010 which criticized his work and "attitude"

4    without justification, downgraded his rating from a 2 ("high contributor") to a 4 ("basic

5    contributor"), and stated that he "[n]eeds improvement in one or more areas."

6        87.        In February 2011, L-3 circulated a document entitled "RFDS Broadband Noise

7    Telecon Agenda" responding to Relator's data analysis.  In this document, L-3 acknowledged that

8    the "synthesizer phase noise from the TSM is the major contributor to the increased broadband

9    noise observed."  Despite this, L-3 continued to focus on optimization and hardware assembly

10   rather than on making changes to TSM design or circuitry that could provide a solution to the

11   problem.  L-3 stated that the RFDS System would not meet the specification requirements for

12   NSC-3 without optimization.

13       88.        On April 11, 2011, in a document labeled "RFDS Broadband Noise Summary,"

14   EDO (then ITT) admitted that the TSM was defective from its initial testing phases.  The paper

15   acknowledged that the levels of broadband noise coming from the TSM during transmission

16   "would require the [interference cancellation system] to achieve 45 decibels cancellation in order

17   for radio receivers to meet specified sensitivity."  ITT acknowledged that this level of noise was

18   "in contrast to the simulated predictions presented at the PDR (July 2004).  However it is

19   consistent with data from TSM engineering development hardware measurement data presented at

20   the CDR (December 2004)."  As described in ¶¶ 55-60, *supra*, EDO had used unrealistic testing

21   conditions in 2004 which served to hide the malfunctioning of the TSM.

22       89.        At this time, the Bertholf had already undergone two "optimization" efforts, and

23   had two open trouble tickets related to problems with the RFDS System.  Defendants

24   recommended additional optimization to the Coast Guard even though Defendants knew that

25   optimization would not fix the identified defects in the RFDS System.

26

27

28

1

2

3

**E. Defendants Knowingly Sought Payment from the Government for a Communications System that Did Not Comply with Material Contractual Requirements and Sought Payment for Optimization Efforts that They Knew Could Not Remedy the Defect**

4  90.  Defendants did not notify the Coast Guard of the defect in the RFDS System, and

5  they have continued to provide the Government with noncompliant RFDS Systems that generate

6  excessive noise, while certifying compliance with requirements that the systems cannot meet and

7  requesting payment. The third Cutter was delivered to the Coast Guard in 2011 and the fourth

8  Cutter was delivered in October 2013, both equipped with noncompliant communications systems.

9  Lockheed has been awarded the contract for production of the communications systems on the

10  fifth and sixth Cutter, which are currently under construction.

11  91.  In support of getting the false claims for noncompliant products paid, Defendants

12  submitted false records and statements, including certifications that the communications system

13  was capable of the required simultaneous operations. L-3 submitted certificates of compliance to

14  Lockheed stating that the RFDS System's performance met the Coast Guard's performance

15  specifications. Lockheed, in turn, submitted certificates of compliance to the Coast Guard, falsely

16  certifying that the performance specifications were met.

17  92.  Not only did L-3 and Lockheed falsely represent that the RFDS System met

18  performance specifications, but they also charged the Government for costly optimization projects

19  to address the problems caused by the defect, thereby increasing the Defendants' profits from their

20  deception. L-3's certificates of compliance to Lockheed noted that, while the RFDS System met

21  the performance specifications, optimization was recommended. Lockheed, in turn, submitted

22  certificates of compliance to the Coast Guard stating that optimization was necessary. The

23  excessive transmitter noise levels generated by the TSM hardware were the primary cause of the

24  RFDS System's communication failures and Defendants knew that optimization would not

25  adequately address the TSM's defects. Nevertheless, L-3 and Lockheed charged the Coast Guard

26  for modifications and at least two optimization efforts on the Bertholf that did not address the

27  systemic deficiencies caused by the design defect of which Defendants were aware.

28

93.     The cost of each optimization project was at least $1.5 million per Cutter, and may have significantly exceeded that amount.  Optimization projects entail retrofitting sets of custom equalizer circuits into the Cutters' already installed communications systems and require continual retuning and calibrating.

**F.      Defendants Billed the Coast Guard for Thousands of Hours of Repair Services Despite Knowing That the RFDS System's Defects Were the Cause of the Problems and Could Not be Remedied by these Services**

94.     In addition to seeking payment for the noncompliant communications system and ineffective optimization efforts, Defendants charged the Coast Guard for thousands of hours to troubleshoot complaints about problems with the communications system that were a byproduct of the RFDS System's defect.  In an "In Depth Review" of the Integrated Defense Technologies for Coast Guard Systems on November 12, 2010, Lockheed reported that 36% of the "help desk" tickets were related to the communications system.  Thirteen tickets were directly related to problems with the RFDS System.

95.     As of September 2010, at least two "trouble tickets" remained open for the Bertholf for communications issues.  One ticket was opened on August 10, 2009 in response to complaints that the Cutter's other radios received static and bleed-over when transmitting from VHF radios.

96.     Another "trouble ticket" was opened a year later on August 23, 2010 in response to complaints that various radios were having channel bleed-over issues and that the RFDS System was causing excess static noise on certain radios.  That ticket was open until May 2011.

97.     By the time that the second ticket was opened, Lockheed, L-3, and ITT had access to the 2007 transmitter noise data as well as Relator's July 2010 test results.  In communications regarding the trouble tickets, none of the Defendants informed the Coast Guard about the RFDS System's defects, although they were fully aware that those defects were the cause of the significant receiver desensitization.  Instead, Defendants continued to charge the Coast Guard for help desk support and to recommend further "optimization" to the vessels.

98.     Lockheed managers refused to inform the Coast Guard of the RFDS System's defects and instead maintained that it was up to the Coast Guard to uncover the problems with the system.

1

2

### G.    Lockheed's Desire to Sell the Government a New Communications System Provided an Additional Motivation for Not Informing the Government

3       99.      In 2010, Lockheed began development of a new communications system, the "Next

4   Generation Communications System," that it hoped to sell to the Government as a replacement for

5   the noncompliant system that it had already sold to the Government.

6       100.     Given the Government's dissatisfaction with the existing RFDS System, Lockheed

7   believed the replacement system would be an easy sell.  Not only would Lockheed not pay for its

8   mistakes with the first system, it would also further profit from them by selling a new one.

9       101.     Upon learning in November 2010 that Lockheed was planning to sell the

10  Government an expensive new communications system that was also flawed, Relator requested a

11  meeting with Lockheed senior managers and staff.  At that meeting, Relator explained the flaws in

12  the new communications system the company was proposing to install, and insisted that it would

13  be far more cost effective and quicker to fix the existing system in which the Government had

14  already invested tens of millions of dollars.  When Relator asked why the company was not

15  endeavoring to fix the existing RFDS system and thus save the Government time and expense,

16  Senior Manager Joe Buss replied, "Why would we want to help them?"

17      102.     Several weeks following the November 2010 meeting at which Relator tried to

18  dissuade Lockheed from attempting to sell a new and flawed communications system to the

19  Government, Lockheed assigned Relator to advise the engineering team that was working to

20  design the new system.  During a number of visits in 2011 to the Eagan, Minnesota, facility where

21  Lockheed was designing the new system, Relator learned that Lockheed had never fully informed

22  the Government of the flaws in the existing system or the corrective measures that might

23  adequately address those problems.  During one of these visits when Relator urged Lockheed

24  management to work with the Coast Guard to address problems with the existing system,

25  Engineering Manager Chris Manuelli replied, "If the Coast Guard doesn't know what's causing

26  their problems, maybe we shouldn't say anything."

27      103.     On September 14, 2011, Relator attended a briefing at the Eagan facility where

28  Lockheed presented a seriously flawed analysis of the new communications system that the

1   company planned to present to the Government.  The analysis assumed the NSC Cutters would

2   operate in "free space" without interference from the ocean surface.  Relator objected that the

3   assumptions did not match actual operating conditions and thus rendered the analysis invalid, but

4   Lockheed engineering management insisted that the analysis would convince the Government of

5   the viability of the system.  "Do you think the Government is smart enough to know this?"  Mr.

6   Manuelli asked Relator.  When Relator persisted in objecting to the use of the deceptive analysis,

7   Mr. Manuelli responded by asking him, "Don't you have a plane to catch?"

8       104.       From late 2011 through mid-2012, Relator continued to object to Lockheed's plan

9   to convince the Government of the value of its new communications system that would not

10  completely correct the problems that had rendered the existing system unable to perform during

11  simultaneous communications.  In response to Relator's continued opposition to Defendants'

12  misrepresentations concerning the RFDS system, Lockheed removed him from further work on

13  that system and, from fall 2011 on, assigned him to work only on short-term, unrelated projects,

14  while denying him the opportunity to work on key engineering assignments such as one involving

15  the development of a "Waveguide Filter" for the Aegis radar system.

16      105.       On July 10, 2012, Lockheed terminated Relator's employment, purportedly as part

17  of a reduction in force.  The company gave Relator 30 minutes to collect his personal belongings

18  and vacate the building.  Although Lockheed did not provide Relator with its purported reason for

19  including him in the lay-off, Relator's level of "retention credits" that the company claims to form

20  the basis for lay-off decisions had dropped dramatically in recent months due to the retaliatory

21  actions Lockheed had taken against him, including a low performance rating for 2010 and

22  exclusion from key engineering assignments during 2011 and 2012.  Lockheed would not have

23  laid Relator off but for his having taken steps to stop the Company's misrepresentations to the

24  government regarding the RFDS system.

25

26

27

28

<h1 align="center">COUNT I</h1>

<strong>Federal False Claims Act<br>
31 U.S.C. §§ 3729(a)-(c)(1986) and 31 U.S.C.§§ 3729(a)(1)(A)-(C)(2009)</strong>

106.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 105 above as though fully set forth herein.

107.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

108.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims, and knowingly failed to disclose material facts, to officers, employees, or agents of the United States Government for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1986) and 31 U.S.C. § 3729(a)(1)(A)(2009).

109.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records and statements, which also omitted material facts, to get false claims paid and that were material to false or fraudulent claims within the meaning of 31 U.S.C. § 3729(b)(1986) and 31 U.S.C. § 3729(a)(1)(B)(2009).

110.    By virtue of the acts described above, Defendants knowingly conspired to submit false and fraudulent claims for payment to the United States and false records and statements material to false claims within the meaning of 31 U.S.C. § 3729(c)(1986) and 31 U.S.C. § 3729(a)(1)(C)(2009). L-3 and Lockheed agreed not to tell the Coast Guard of the defects in the RFDS System and to continue charging for "optimizations" and repairs.

111.    The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid claims that would not have been paid if the Government had been aware of Defendants' misrepresentations and omissions.

112.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

113.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation as described herein.

## COUNT II

**Claim on Behalf of Relator Stuart Rabinowitz for Retaliation Under the False Claims Act, 31 U.S.C. § 3730(h)**

114.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 105 above as though fully set forth herein.

115.     This is a claim pursuant to 31 U.S.C. § 3730(h) to make Relator whole for Defendant Lockheed's unlawful termination of his employment as a consequence of lawful acts he undertook to report, and to stop, what he reasonably believed were Lockheed's violations of the False Claims Act, as well as lawful acts he took in furtherance of a possible action for violation of the False Claims Act.

116.     Relator's lawful acts, which § 3730(h) protects from retaliation, include:

117.     Notifying Lockheed management in a memorandum dated August 3, 2010, of numerous failures he had discovered in the NSC communications system, and recommending additional testing and analysis, as stated *supra* in ¶¶ 77-78.

118.     Warning Lockheed in a September 20, 2010, memorandum that excess transmitter noise had and would continue to have a substantial impact on the communication system's performance, and urging the company to resolve this issue "urgently", as stated *supra* in ¶ 80-81;

119.     Insisting in meetings in November 2010 that Lockheed could address the problems with the communications system more cost-effectively by fixing the existing system than by selling the Government a new and also flawed system, as stated *supra* in ¶ 101;

120.     Objecting on or around September 14, 2011, to Lockheed's use of an analysis resting on false assumptions regarding the location of the NSC Cutters in "free space" rather than on the ocean's surface to convince the Government of the viability of the new system, as stated *supra* in ¶ 103.

121.     Defendant Lockheed terminated Relator's employment on July 20, 2012, in retaliation for Relator's lawful acts described above in reporting, attempting to stop, and acting in furtherance of other efforts to stop what he reasonably believed were actions by Defendants in violation of the False Claims Act.

1    122.    Defendant Lockheed's termination of Relator violated 31 U.S.C. § 3730(h), which
2 prohibits retaliation by employers against employees who investigate or report false statements
3 within the meaning of 31 U.S.C. § 3729.

4    123.    As a direct and proximate result of the foregoing, Relator has lost the benefits and
5 privileges of employment, and has suffered additional economic and non-economic damages
6 including severe emotional anguish and irreparable, continuing harm to his reputation and career.
7 Relator is entitled to all relief necessary to make him whole.

8                                            PRAYER

9    WHEREFORE, *qui tam* Relator Stuart Rabinowitz prays for judgment against Defendants
10 as follows:

11    1.    that Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

12    2.    that this Court enter judgment against Defendants in an amount equal to three times
13 the amount of damages the United States has sustained because of Defendants' actions in violation
14 of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31
15 U.S.C. § 3729;

16    3.    that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the
17 Federal False Claims Act;

18    4.    that this Court enter judgment against defendants pursuant to 31 U.S.C. § 3730(h)
19 including an order reinstating Relator to his employment with the full seniority and benefits he
20 would have had but for his retaliatory constructive discharge or alternatively actual discharge and
21 awarding him two times the amount of his back pay and compensation for special damages
22 including litigation costs and reasonable attorney's fees;

23    5.    that Relator be awarded all costs of this action, including attorneys' fees and
24 expenses; and

25    6.    that Relator recover such other relief as the Court deems just and proper.

26

27

28

---

1    DEMAND FOR JURY TRIAL

2         Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

3    trial by jury.

4         Dated: March 5, 2014

5

6                        Respectfully submitted,

7

8

9                        Claire M. Sylvia (State Bar No. 138990)
                         Larry P. Zoglin (State Bar No.  87313)
10                       PHILLIPS & COHEN LLP
                         100 The Embarcadero, Suite 300
11                       San Francisco, CA  94105
                         Tel: (415) 836-9000
12                       Fax: (415) 936-9001
                         Email: cms@pcsf.com
13

14                       David J. Marshall (District of Columbia Bar No. 469949)*
                         KATZ, MARSHALL & BANKS, LLP
15                       1718 Connecticut Ave., N.W., 6th Floor
                         Washington, D.C. 20009
16                       Tel: (202) 299-1140
                         Fax: (202) 299-1148
17                       Email: marshall@kmblegal.com
                         *Application for *pro hac vice* admission pending
18

19                       Counsel for Relator

20

21

22

23

24

25

26

27

28